16 MAG 2650                    ORIGINAL

Approved: _____
          ELISHA KOBRE
          Assistant United States Attorney

Before:   HONORABLE HENRY PITMAN
          United States Magistrate Judge
          Southern District of New York

U.S. DISTRICT COURT
FILED
APR 22 2016
S.D. OF N.Y.

- - - - - - - - - - - - - - - x
                              :
UNITED STATES OF AMERICA      :     **SEALED COMPLAINT** DOC #___
                              :
      - v. -                  :     Violation of
                              :     18 U.S.C. §§ 1028A, 1343
EMIL RENSING,                 :
                              :     COUNTY OF OFFENSE:
            Defendant.        :     NEW YORK
                              :
- - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

          ANGELA E. TASSONE, being duly sworn, deposes and says
that she is a Special Agent with the Federal Bureau of
Investigation (the "FBI"), and charges as follows:

Count One

(Wire Fraud)

          1.   From in or about October 2010 up to and including
in or about August 2015, in the Southern District of New York
and elsewhere, EMIL RENSING, the defendant, wilfully and
knowingly, having devised and intending to devise a scheme and
artifice to defraud, and for obtaining money and property by
means of false and fraudulent pretenses, representations and
promises, and attempting to do so, transmitted and caused to be
transmitted by means of wire, radio, and television
communication in interstate and foreign commerce, writings,
signs, signals, pictures, and sounds for the purpose of
executing such scheme and artifice, to wit, RENSING defrauded
his employer of more than $8 million through material
misrepresentations about companies owned and controlled by
RENSING that were retained to provide services to RENSING's

1

employer, and in connection therewith and in furtherance thereof, RENSING caused wire communications to be sent in interstate commerce.

(Title 18, United States Code, Sections 1343 & 2.)

### Count Two

### (Aggravated Identity Theft)

2. From in or about October 2010 up to and including in or about August 2015, in the Southern District of New York and elsewhere, EMIL RENSING, the defendant, willfully and knowingly, and during and in relation to a felony violation enumerated in Title 18, United States Code, Section 1028A(c), to wit, wire fraud, in violation of Title 18, United States Code, Section 1343, as charged in Count One of this Complaint, did transfer, possess, and use, without lawful authority, a means of identification of another person, to wit, RENSING used, and caused to be used, the names of former business associates and other actual persons, without the permission or knowledge of those persons, during and in relation to the offense charged in Count One of this Complaint.

(Title 18, United States Code, Sections 1028A and 2.)

The bases for my knowledge and for the foregoing charge are, in part and among other things, as follows:

3. I am a Special Agent with the Federal Bureau of Investigation ("FBI"). I have been an FBI Special Agent for approximately two years and I am assigned to a White Collar Fraud squad within the New York Division. As part of my work at the FBI, I have received training regarding fraud and white collar crimes. I am familiar with the facts and circumstances set forth below from my personal participation in the investigation, including my examination of reports and records, interviews I have conducted, and conversations with other law enforcement officers and other individuals. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, unless noted otherwise.

2

## OVERVIEW OF THE SCHEME TO DEFRAUD

4.   As set forth below, EMIL RENSING, the defendant, who was Chief Digital Officer of a premium movie network (the "Network"), defrauded the Network of more than $8 million over the course of his five year employment with the Network. Through his position as Chief Digital Officer of the Network, RENSING caused the Network to contract with vendor companies owned and controlled by RENSING to perform digital media services for the Network and to perform those services through vendor personnel identified in the contracts.   In truth and in fact, however, the promised services were, in large part, never performed, and the vendor personnel designated in the contracts to perform the services – which included several of RENSING's former professional associates and business partners – had never heard of the vendors or performed services for the Network. These individuals were further unaware that their names were being used by RENSING in this manner.

5.   EMIL RENSING, the defendant, concealed the fraudulent scheme by, among other things, using false and stolen identities to hide RENSING's own involvement in the scheme.   As to one of the vendors RENSING owned and controlled and used to perpetrate the scheme ("Vendor-1"), RENSING provided the Network with a false name and e-mail address as the "contact" to be used by the Network to communicate with Vendor-1.   As to a second vendor, ("Vendor-2"), RENSING provided the Network with the name of a personal acquaintance as a "project manager" and "contact" for Vendor-2 when, in truth and in fact, this acquaintance had nothing to do with Vendor-2.   Unbeknownst to this personal acquaintance, RENSING also established an e-mail account in that acquaintance's name which RENSING, posing as the acquaintance, used regularly to communicate with the Network about the vendor's billing and other administrative matters.

6.   After the Network learned of the fraudulent scheme conducted by EMIL RENSING, the defendant, RENSING was interviewed by attorneys for the Network.   During this interview, which was recorded at the request of RENSING and his counsel, RENSING made multiple false statements to further conceal his fraudulent scheme.

## THE DEFENDANT

7.   From records provided by the Network, I have learned that, beginning on or about April 1, 2010, through in or about August 2015, EMIL RENSING, the defendant, was employed as

Chief Digital Officer of the Network. As Chief Digital Officer, RENSING was responsible for the Network's digital technology which, among other things, allows the Network to provide content, such as movies, to customers on a variety of electronic devices.

8.   From my interview of the Chief Executive Officer of the Network, I have learned, among other things, that as part of his duties as Chief Digital Officer, EMIL RENSING, the defendant, was responsible for identifying and retaining most of the vendors engaged to provide services for the Network's digital department.

## THE NETWORK'S PROCESS FOR ENGAGING VENDORS

9.   From my interview with a Manager of Financial Reporting and Planning for the Programming and Digital Department of the Network (the "Network Manager"), and from records provided by the Network, I have learned, among other things, the following:

   a.   Before a new vendor begins to perform services for the Network, the vendor typically completes and submits a form listing certain information about the vendor such as the vendor's address and phone number and the name and email address of a "contact" at the vendor (the "Vendor Information Form").

   b.   Services to be provided to the Network by a vendor are pursuant to a written contract, known as a "services agreement" or "master services agreement" ("MSA"), between the Network and the vendor. The MSAs are signed by an authorized representative of the Network and an authorized representative of the vendor.

   c.   The particular work to be performed by the vendor is described in one or more "statements of work" ("SOWs"), which reference and are made part of the initial MSA. Each SOW describes a specific project to be performed by the vendor and lists, among other things, the "Project Manager" for both the vendor and the Network; "Key Personnel" of the vendor who will perform the services; and a "Project Overview" describing the services to be performed. Each SOW is signed by an authorized representative of the Network and an authorized representative of the vendor.

d. As milestones for services provided under an SOW are reached, vendors submit invoices for payment to the Network. Beginning at least in or about 2012, the Network provided an online interface through which vendors could submit invoices to the Network electronically.

## RENSING'S SCHEME TO DEFRAUD THE NETWORK THROUGH VENDOR-1 AND THE USE OF STOLEN IDENTITIES

10. From records provided by the Network, and from interviews with individuals whose signatures appear on behalf of Vendor-1 on MSAs and SOWs between the Network and Vendor-1 and individuals listed as "key personnel" on Vendor-1 SOWs, I have learned, among other things, the following:

a. On or about October 5, 2010, a "Vendor Information Form," for Vendor-1 was submitted to the Network (the "Vendor-1 Information Form"). The Vendor-1 Information Form listed, among other things: the address for Vendor-1 as the address of a particular accounting firm located in New York, New York (the "Accounting Firm"); the contact for Vendor-1 as a particular female (the "Vendor-1 Contact") whose name does not resemble the name of EMIL RENSING, the defendant; and an e-mail address for the Vendor-1 Contact as a particular e-mail address beginning with the name of the Vendor-1 Contact (the "Vendor-1 E-Mail Account"). As described below, I believe that RENSING used the Vendor-1 E-Mail Account which, according to the Vendor-1 Information Form belonged to the Vendor-1 Contact, to hide from the Network that RENSING was communicating on behalf of Vendor-1. The Vendor-1 Information Form also contains an "Authorized Vendor Signature" of the Vendor-1 Contact as "Accounting Manager" of Vendor-1.

b. On or about October 5, 2010, the same date the Vendor-1 Information Form was purportedly completed and submitted to the Network, an IRS form W-9 "Request for Taxpayer Identification Number and Certification" for Vendor-1 (the "Vendor-1 W-9") was also submitted to the Network. The signature appears to be that of a particular individual ("Victim-1"). From my interview with Victim-1, I have learned among other things, that RENSING and Victim-1 had previously been business partners in an unrelated company and that Victim-1 had not heard of Vendor-1, did not sign the Vendor-1 W-9, and provided no services to the Network.

c. On or about January 1, 2011, the Network entered into a "Services Agreement" with Vendor-1 (the "2011

5

Vendor-1 Services Agreement"). Under the 2011 Vendor-1 Services Agreement, it was agreed that Vendor-1 would provide certain "technical services" to the Network in exchange for compensation. The term of the Services Agreement was six months. Under the 2011 Vendor-1 Services Agreement, Vendor-1 was to "report directly" to RENSING. The 2011 Vendor-1 Services Agreement contains the signature of Victim-1 as "President" of Vendor-1. From my interview with Victim-1, I have learned that Victim-1 is not President of Vendor-1, has not heard of Vendor-1, did not sign the 2011 Vendor-1 Services Agreement, and provided no services for the Network.

d. On or about January 1, 2014, the Network entered into a new "Master Services Agreement" with Vendor-1 (the "2014 Vendor-1 MSA"). From my review of the fully executed 2014 Vendor-1 MSA, I have learned that this agreement contains the signature on behalf of Vendor-1 of a particular individual ("Victim-2"). From an interview of Victim-2, I have learned that Victim-2 has never heard of Vendor-1, did not sign the 2014 Vendor-1 MSA, and provided no services to the Network.

11. I have reviewed seven fully executed SOWs for services to be performed by Vendor-1 for the Network, SOW#1 through SOW#7. From my review of these SOWs, I have learned the following, among other things:

a. Each of these SOWs contains the signature, on behalf of Vendor-1, of Victim-2. From an interview of Victim-2, I have learned that Victim-2 did not sign any of these Vendor-1 SOWs.

b. Each of these SOWs lists the Vendor-1 Contact as a "project manager" for the project. I have also reviewed the "Key Personnel" listed in each of these SOWs who were designated by Vendor-1 to perform the services for the Network described in the SOW. As described below, based upon interviews of several "key personnel" listed on Vendor-1's SOWs, I have learned that most of those individuals never heard of Vendor-1 and never performed work for the Network.

12. From my review of invoices submitted by Vendor-1 to the Network and a spreadsheet summarizing invoices submitted by Vendor-1 and payments by the Network to Vendor-1, I have learned that, from in or about November 2010 through in or about September 2014, Vendor-1 submitted invoices to the Network and was paid on the basis of those invoices at least approximately $8,560,752.

13.   I have interviewed several of the "key personnel" listed on Vendor-1's SOWs.   From these interviews, I have learned that many of the individuals listed as key personnel who were to perform work under the Vendor-1 SOWs never heard of Vendor-1 and never performed work for the Network.   Several of these individuals had previously worked with RENSING at different unrelated companies.   In particular, I have learned the following:

a.   Among the "key personnel" listed on SOW#5 are three particular individuals ("Victim-3," "Victim-4," and "Victim-5").   Based upon my interviews of Victim-3 and Victim-4, I have learned that RENSING worked together with Victim-3, Victim-4, and Victim-5 at a different company before RENSING began working for the Network.   Victim-3 and Victim-4 never heard of Vendor-1 and never performed work for the Network. From both Victim-3 and Victim-4, I have learned that Victim-5 currently resides outside the United States.

b.   The "key personnel" listed on SOW#6 are two particular individuals ("Victim-6" and "Victim-7").   Based upon my interview with Victim-6, I have learned that Victim-6 has never heard of RENSING or Vendor-1 and has never performed work for the Network.   Based upon my interview with Victim-7, I have learned that Victim-7 and RENSING know each other professionally but that Victim-7 has also never heard of Vendor-1 and has never performed work for the Network.

14.   Based upon my review of records provided by the service provider for the Vendor-1 E-Mail Account (the "E-Mail Service Provider"), I believe that EMIL RENSING, the defendant, used the Vendor-1 E-Mail Account to hide from the Network that RENSING acted on behalf of Vendor-1.   In particular, I have learned, among other things, that the "recovery e-mail" account listed for the Vendor-1 E-Mail Account begins with "emilr" and is registered to RENSING at RENSING's home address in New York, New York ("Rensing's Residence"); the phone number associated with the Vendor-1 E-Mail Account is a particular phone number which I have learned, based upon a review of records from a phone service provider, is registered to RENSING; and a particular internet protocol ("IP") address registered to RENSING at Rensing's Residence ("Rensing IP-1") was used to log in to the Vendor-1 E-Mail Account on multiple occasions from at least in or about May 2015 through in or about September 2015.

15.   Based upon my review of e-mails from another e-mail account registered to EMIL RENSING, the defendant, and e-mails provided by the Network, I have learned that a person purporting to be the Vendor-1 Contact, the contact person and accounting manager listed on the Vendor-1 Information Form, regularly used the Vendor-1 E-Mail Account to communicate with the Network about administrative matters relating to Vendor-1's business with the Network, including regarding Vendor-1's invoices.   Based upon the records described above from the E-Mail Service Provider, I believe that these e-mails were sent by RENSING.   From my review of a website maintained by the E-Mail Service Provider, I have learned that the E-Mail Service Provider does not maintain any servers in New York State and that, as a result, all e-mails sent or received by the Vendor-1 E-Mail Account traveled in interstate commerce.

16.   I have interviewed the Network's former Vice President of Engineering from at least in or about 2011 through in or about October 2013 (the "Former Vice President of Engineering"), a large part of the period during which Vendor-1 was allegedly providing services to the Network.   During this interview, the Former Vice President of Engineering reviewed invoices from Vendor-1 and other records from the Network reflecting alleged services performed by Vendor-1 for the Network.   Based upon a review of these records, the Former Vice President of Engineering concluded that services listed on Vendor-1's invoices were performed, not by Vendor-1, but rather in-house by employees of the Network or by vendors other than Vendor-1 who were paid directly by the Network.

17.   From my review of records from a particular bank based in New York, New York, I have learned that, on or about November 10, 2010, a bank account was opened in the name of Vendor-1 listing EMIL RENSING, the defendant, as the President of Vendor-1 (the "Vendor-1 Account").   RENSING is the sole individual with signature authority over the Vendor-1 Account. From my review of a spreadsheet prepared by an analyst with the FBI based upon records for the Vendor-1 Account, I have learned, among other things, the following:

a.   Between in or about December 2010 and in or about September 2014, the Vendor-1 Account received approximately $8,226,032.93 from the Network as payments for services purportedly provided by Vendor-1.

b.   No payments were made from the Vendor-1 Account directly to any of the key personnel listed in the

Vendor-1 SOWs as the individuals who would perform services on behalf of Vendor-1 for the Network.

    c. While payments were made from the Vendor-1 Account to a particular payroll company (the "Payroll Company"), I have learned based upon my review of records from the Payroll Company that only one of the eighteen individuals listed in the Vendor-1 SOWs as key personnel was employed or otherwise paid by Vendor-1 through the Payroll Company ("Individual-1").   Records from the Payroll Company show that Individual-1 was paid a total of approximately \$32,577 in 2013 and approximately \$18,090 in 2014.

    18. From my review of records from the Accounting Firm relating to Vendor-1, I have learned that, in tax years 2012 through 2014, Vendor-1 did not file an IRS Form 1099-Misc, a tax form used to report payments to independent contractors, for any of the "key personnel" listed on the Vendor-1 SOWs.

    19. From the Network Manager, I have learned that, in a meeting in or about September 2014, RENSING said that the Network should wrap up its use of Vendor-1.   The last Vendor-1 invoice was paid to the Vendor-1 Account by the Network on or about September 18, 2014.

## RENSING'S SCHEME TO DEFRAUD THE NETWORK THROUGH VENDOR-2 AND THE USE OF STOLEN IDENTITIES

    20. From records provided by the Network, and from interviews with individuals whose signatures appear on behalf of a particular company ("Vendor-2") on a Vendor Information Form, MSA and SOWs between the Network and Vendor-2, and individuals listed as "key personnel" on Vendor-2 SOWs, I have learned, among other things, the following:

    a. A "Vendor Information Form," for Vendor-2, dated on or about December 5, 2014, was submitted to the Network (the "Vendor-2 Information Form").   The Vendor-2 Information Form lists, among other things: the address for Vendor-2 as a particular address in New York, New York (the "Vendor-2 Address"); the contact for Vendor-2 as a particular individual ("Victim-8") who, I have learned from interviewing Victim-8, is a personal  acquaintance of RENSING but never heard of Vendor-2 and never performed services for the Network; and an e-mail address for Victim-8 which, I have learned from Victim-8, was not used by Victim-8 and which begins with Victim-8's initials (the "Victim-8 E-Mail Account").

b.    Vendor Information Form-2 also contains a phone number for Victim-8 which I have learned from phone records is registered to RENSING.    Based upon records relating to the Victim-8 E-Mail Account described below, I believe that RENSING was the user of the Victim-8 E-Mail Account and that RENSING used this e-mail account to hide from the Network that RENSING acted on behalf of Vendor-2.

c.    The Vendor-2 Information Form contains an "Authorized Vendor Signature" of a particular individual as "Vice President" of Vendor-2 ("Victim-9").    From my interview with Victim-9, I have learned, among other things, that Victim-9 previously worked with RENSING at the same unrelated company in which Victim-1 was business partners with RENSING; Victim-9 did not sign the Vendor-2 Information Form; Victim-9 has never heard of Vendor-2; and Victim-9 has never performed services for the Network.

d.    An IRS form W-9 "Request for Taxpayer Identification Number and Certification" for Vendor-2 (the "Vendor-2 W-9"), dated on or about November 1, 2014 and containing a signature, was also submitted to the Network.    From my interview with Victim-9, I have also learned that the signature appearing on the Vendor-2 W-9 appears similar to Victim-9's true signature but that Victim-9 did not sign this document.

e.    On or about November 1, 2014, the Network entered into a "Master Services Agreement" with Vendor-2 (the "2014 Vendor-2 MSA").    The 2014 Vendor-2 MSA contains the signature, on behalf of Vendor-2, of Victim-9 as "Vice President" of Vendor-2.    From my interview with Victim-9, I have learned that Victim-9 did not sign the 2014 Vendor-2 MSA.

f.    From my review of e-mails provided by the Network, I have learned, among other things that, from on or about December 5, 2014, through on or about March 30, 2015, an attorney for the Network (the "Network Attorney") e-mailed the 2014 Vendor-2 MSA and associated Vendor-2 SOW#1 through SOW#6 to the Victim-8 E-Mail Account asking that the agreements be signed by a representative of Vendor-2 and returned for execution by the Network.    All of the SOWs were returned to the Network signed, including SOW#4 through SOW#6, which were sent via e-mail on or about March 30, 2015, from the Victim-8 E-Mail Account to the Network Attorney.

g.     From my review of fully executed versions of the 2014 Vendor-2 MSA and Vendor-2 SOW#1 through SOW#6, I have learned, among other things, that each of these seven documents contains signatures purporting to belong to Victim-9 as "Vice President" of Vendor-2.   From my review of these six signatures, I have learned that the signatures on Vendor-2's SOW#1 and SOW#2 appear similar to each other but are different from the signatures on Vendor-2's SOW#3 through SOW#6.   Based upon my interview of Victim-9, and as described above, I have learned that Victim-9 did not sign any of these documents.

h.     I have also learned that each of the Vendor-2 SOWs lists Victim-8 as "project manager" for the services Vendor-2 was to provide for the Network.   As described above, from an interview with Victim-8, I have learned that Victim-8 never heard of Vendor-2 and never performed services for the Network.

i.     From my review of the Vendor-2 SOWs, I have learned the Vendor-2 SOW#1, SOW#3, and SOW#4 list the key personnel for those projects as "[n]one."   From my review of Vendor-2 SOW#5, I have learned that the "Project Name" for that project was "Metadata Feed Standardization" and the key personnel listed for this project was Victim-3, the same individual falsely listed as one of the key personnel on Vendor-1 SOW#5.   From my review of Vendor-2 SOW#6, I have learned that the "Project Name" for that project was "Conversion and Lead Tracking System" and the key personnel listed for this project was Victim-4, another individual falsely listed as one of the key personnel on Vendor-1 SOW#5.   From interviews with Victim-3 and Victim-4, I have learned that neither of those individuals heard of Vendor-2 or performed services for the Network.

j.     From e-mails provided by the Network, I have learned that, on or about March 24, 2015, an e-mail was sent from the Victim-8 E-Mail Account which, for reasons described below I believe was used by RENSING, to RENSING's e-mail account with the Network, stating, in pertinent part, "[g]ot [Victim-4] and [Victim-3] confirmed for the 2 projects. . . . [Victim-3] is super excited to be off her current project . . ."   On or about March 25, 2015, RENSING forwarded this e-mail to the Network Attorney adding, in pertinent part, "[f]or the meta data feed project, the key person is [Victim-3].   For the tracking project, the key person is [Victim-4]."

k.     From my review of invoices submitted by Vendor-2 to the Network for services purportedly performed under

the Vendor-2 SOWs, I have learned that the address listed for Vendor-2 is the same Vendor-2 Address listed on Vendor Information Form-2. Each of the Vendor-2 invoices further states that payment may be made to a particular bank account (the "Vendor-2 Account").

l. From my review of invoices submitted by Vendor-2 to the Network and a spreadsheet summarizing invoices submitted by Vendor-2 and payments by the Network to Vendor-2, I have learned that, from in or about December 2014 through in or about May 2015, Vendor-2 submitted invoices to the Network and was paid on the basis of those invoices at least approximately $398,620.

m. From my review of records provided by the Network relating to the electronic submission of invoices, I have learned, among other things, that on or about March 4, 2015, three Vendor-2 invoices were submitted electronically to the Network via a particular IP address ("Rensing IP-2"). I have learned from records provided by the service provider for Rensing IP-2 that Rensing IP-2 is registered to RENSING at Rensing's Residence.

21. Based upon my review of records provided by the E-Mail Service Provider, I believe that EMIL RENSING, the defendant, was the user of the Victim-8 E-Mail Account and that RENSING did so to hide from the Network that RENSING was communicating on behalf of Vendor-2. In particular, I have learned that, from in or about May 2015 through in or about August 2015, Rensing IP-1, which was registered to RENSING at Rensing's Residence, was used to log in to the Victim-8 E-Mail Account on numerous occasions. In addition, the "recovery e-mail" listed for the Victim-8 E-Mail Account is a particular e-mail account also registered in the name of Victim-8 (the "Victim-8 Recovery Account"). From my review of records for the Victim-8 Recovery Account and a particular internet service provider, I have learned that the Victim-8 Recovery Account was created from a particular IP address also registered to RENSING ("Rensing IP-3"). Moreover, from in or about May 2015 through in or about August 2015, the Victim-8 Recovery Account was also accessed multiple times through Rensing IP-1.

22. From an interview with Victim-8, I have learned, among other things, that Victim-8 has not heard of Vendor-2, did not sign documents or correspond on behalf of Vendor-2, and did not perform any services for the Network. Victim-8 has not used the Victim-8 E-Mail Account. Victim-8 knows EMIL RENSING, the

defendant, as a personal acquaintance.   Victim-8 has never visited Rensing's Residence.

23.   From my review of records from a particular bank based in New York, New York, I have learned that the Vendor-2 Account, which was listed on Vendor-2's invoices, is in the name "Emil Rensing International, Inc.," which is solely controlled by EMIL RENSING, the defendant.   The Network's payments for Vendor-2's invoices, totaling at least approximately $398,620, were made to a different bank account provided by Vendor-2, also in the name "Emil Rensing International, Inc.," which is likewise solely controlled by RENSING.   From my review of records for both of these bank accounts and spreadsheets prepared by an analyst with FBI based upon records for the accounts, I have learned that no payments were made from these accounts to Victim-8, Victim-9, or any of the key personnel listed in the Vendor-2 SOWs.

24.   From the Network Manager, I have learned that in or about late March or early April 2015, the Network Manager visited the Vendor-2 Address listed as the address for Vendor-2 on the 2014 Vendor-2 MSA, the Vendor-2 SOWs, and Vendor-2's invoices.   The front desk employees in the building located at the Vendor-2 Address told the Network Manager that they had never heard of Vendor-2.   After the Network Manager related to EMIL RENSING, the defendant, that there was no company named Vendor-2 at the Vendor-2 Address, RENSING replied that Vendor-2 was going through a rebranding.   On or about April 9, 2015, the Network Manager again visited the Vendor-2 Address, along with a financial analyst employed at the Network.   On this occasion, the Network Manager observed, on the door to the suite listed in the Vendor-2 Address, a sign for a particular internet-based video newscast about the automotive industry, which was owned by RENSING.

25.   From my review and comparison of records for the Vendor-1 E-mail Account, listed on the Vendor-1 Information Form as belonging to the Vendor-1 Contact, and the Victim-8 E-Mail Account, listed on the Vendor-2 Information Form as belonging to Victim-8, the contact for Vendor-2, I have learned among other things, that on multiple occasions, both of those accounts were accessed nearly simultaneously from RENSING's Residence via Rensing IP-1.   For example, both e-mail accounts were accessed via Rensing IP-1, within a one-minute period, on or about May 25, 2015, May 27, 2015, May 31, 2015, and August 27, 2015.

26.   From an interview with the current Vice President of Engineering for the Network (the "Vice President of Engineering") I have learned, among other things, that much if not all of the services to be provided by Vendor-2 as described in the Vendor-2 SOWs was either performed by others, including the Vice President of Engineering, rather than Vendor-2, or was never performed.

### RENSING'S FALSE STATEMENTS TO COUNSEL FOR THE NETWORK

27.   From my review of an audio recording of an interview with EMIL RENSING, the defendant, conducted by an attorney for the Network on or about August 17, 2015, which was audio recorded with the consent of RENSING and his attorney, I have learned among other things that, during this interview, RENSING made numerous false statements.   Among other things, during this interview RENSING falsely stated that RENSING has no ownership, directly or indirectly, or any financial interest, in Vendor-2.   As described above, the bank accounts used by Vendor-2 in the scheme are controlled solely by RENSING.   RENSING also falsely stated during this interview that Victim-1 performed services for the Network on behalf of Vendor-1 and that Victim-8 and Victim-9 worked for Vendor-2.   As described above, based upon my interviews with these individuals, I have learned that these statements are false.

WHEREFORE, deponent prays that an arrest warrant be issued for EMIL RENSING, the defendant, and that RENSING be imprisoned or bailed, as the case may be.

ANGELA E. TASSONE
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

Sworn to before me this
22nd day of April 2016

UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

14